ZACHARY CANTOR (SBN 270507)
CANTOR LAW
1112 Montana Avenue, Suite C
Santa Monica, CA 90403
T.   310.393.6620
F.   310.393.6680
E.   Zachary@CantorLawyers.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **HENRIK ERIKSEN, an Individual;** | **CASE NO.** |
| **Plaintiff,** | **COMPLAINT FOR:** |
| **v.** | |
| **3i GROUP PLC, a British Corporation; BOCONCEPT HOLDING A/S, a Danish Corporation; BOCONCEPT NORTH AMERICA INC, a Kansas Corporation; BOCONCEPT USA, INC., a Kansas Corporation; BOCONCEPT FRANCHISE, INC., a Kansas Corporation; BORIS TOBIAS KAWOHL, an Individual, SANNA SUVANTO-HARSAAE, an Individual, MIKAEL KRUSE JENSEN, an Individual, KLAUS SKOV MORTENSEN, an Individual JON SKAALERUD, an Individual, DAVID ANDERBERG, an Individual and DOES 1-25;** | 1. **WHISTLEBLOWER RETALIATION** [Cal. Lab. Code § 1102.5 (b)]; <br> 2. **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)** [18 U.S.C. § 1962(c) and 18 U.S.C. § 1513(e), *et. seq.*]; <br> 3. **CIVIL CONSPIRACY IN VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT** [18 U.S.C. § 1962(d) and 18 U.S.C. § 1513(e), *et. seq.*]. <br> 4. **CIVIL CONSPIRACY** <br> 5. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;** <br> 6. **FAILURE TO PAY FINAL WAGES;** <br> 7. **FAILURE TO PROVIDE ACCURATE ITEMIZED WAGE STATEMENTS;** <br> 8. **VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200;** <br> 9. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY** |
| **Defendants.** | **DEMAND FOR JURY TRIAL** |

Plaintiff HENRIK ERIKSEN, by and through his counsel, claims and alleges as follows:

## INTRODUCTION

1. This is an individual action brought by Plaintiff HENRIK ERIKSEN against Defendants 3i GROUP PLC, a British Corporation, BOCONCEPT HOLDING A/S, a Danish Corporation, BOCONCEPT NORTH AMERICA, INC., a Kansas Corporation, BOCONCEPT USA, INC., a Kansas Corporation, BOCONCEPT FRANCHISE, INC., a Kansas Corporation;  BORIS TOBIAS KAWOHL, SANNA SUVANTO-HARSAAE, MIKAEL KRUSE JENSEN, KLAUS SKOV MORTENSEN, JON SKAALERUD and DAVID ANDERBERG, for whistleblower retaliation in violation of California Code § 1102.5 (b), RICO, civil conspiracy, and intentional infliction of emotional distress.

## PARTIES, AGENCY, VENUE AND JURISDICTION

2. The Court has jurisdiction over the action because one of Plaintiff's claims arise under Federal statutes and there is diversity between Plaintiff and all Defendants. Venue is appropriate because the actions that form the basis for Plaintiff's claims occurred in Riverside County, California, which is within this District.

3. Plaintiff HENRIK ERIKSEN ("Plaintiff") is a resident of Riverside County, California. At all times pertinent, Plaintiff worked as the CEO for the American operations of Defendants 3i GROUP PLC, BOCONCEPT HOLDING A/S (herein "BoConcept" or "Defendant") and affiliated entity Defendants; Plaintiff acted as head of the Defendants' operations in the United States (overall US Brand performance and client satisfaction) - while also Head of BoConcept's Global Task Force (dealing with BoConcept's most challenged market circumstances and the most financially or operationally troubled franchisees globally).

4. BORIS TOBIAS KAWOHL was at all times relevant to this Action as Partner at 3i GROUP PLC and Co-Chairman at BoConcept Holding A/S, and also principally works from the same corporate office location as that entity.  Kawohl personally resides in The Netherlands (Holland)

5. SANNA SUVANTO-HARSAAE was at all times relevant to this Action as Chairman at BoConcept Holding A/S, and also principally works from the same corporate office location as that entity.  Suvanto-Harsaae personally resides in Denmark.

6. MIKAEL KRUSE JENSEN was at all times relevant to this Action as Director of BoConcept North America, Inc. and CEO of BoConcept Holding A/S, and also principally works from the same corporate office location as that entity. Jensen personally resides in Denmark.

7. KLAUS SKOV MORTENSEN was at all times relevant to this Action as Treasurer of BoConcept North America, Inc. and CFO of BoConcept Holding A/S, and also principally works from the same corporate office location as that entity. Mortensen personally resides in Denmark.

8. JON SKAALERUD was at all times relevant to this Action as the Global Human Resources Officer at BoConcept Holding A/S, and also principally works from the same corporate office location as that entity. Skaalerud personally resides in Denmark.

9. DAVID ANDERBERG was at all times relevant to this Action the US Country Manager at BoConcept USA Inc. and principally works from the same corporate office location as that entity. Anderberg personally resides in New Jersey.

10. Directors, officers and managers Boris Tobias Kawohl, Sanna Suvanto-Harsaae, Mikael Kruse Jensen, Klaus Skov Mortensen, Jon Skaalerud, and David Anderberg  have breached their fiduciary duties to the shareholders and can be held personally liable as Agents, Directors, Officers and/or Managers for the frauds that they advanced with prior knowledge pursuant to RICO under 18 USC

1962 (a), 1961(5) and 18USC 1341 and 1343, Sections 1513e, and 15 U.S.C.S. § 7201 *et seq*., because they participated in fraud and retaliatory conduct.

11. Plaintiff is informed, believes, and thereupon alleges that each Defendants are, and at all times relevant herein were, the agent of his, her, or its co-Defendants, and in committing the acts alleged herein, were acting within the scope of his, her, or its authority as such agent, and with the knowledge, permission, and consent of his, her, or its co-Defendants.

## **GENERAL ALLEGATIONS**

12. By this reference, Plaintiff alleges and incorporates herein each and every allegation set forth in all previous paragraphs of the Complaint.

13. This case arises under the Whistleblower Provisions of the California Code, violations of RICO, civil conspiracy, and intentional infliction of emotional distress. Defendants violated provisions of the California Labor Code and RICO by terminating or discharging Plaintiff's personal employment contract on October 24, 2024, with an effective termination date of January 24, 2025, after Plaintiff alerted his superiors to a pattern of willful fraud and lack of legal compliance, which included numerous and varied actions and lack of actions described herein.

**Visa Fraud:**

14. Defendants routinely engaged in immigration fraud, filling out fraudulent applications for permanent residency and visas for foreign workers claiming that they worked for the U. S. entity (BoConcept USA, Inc.), but actually working for the foreign entity (BoConcept Holding A/S, Inc.), or working for other, unrelated US entities, certain BoConcept Franchisees in the US. This was done in a deliberate attempt by Defendants to defraud the U.S. government, because Defendants assessed these foreign workers would be more likely to receive visa and permanent residency approval if they lied and filed fraudulent applications. As Defendants, fraudulently, secured U.S. jobs with 'non-qualified' foreign

nationals - highly qualified American nationals (workers) were prevented to fill these job openings in the U.S. It is legally required to publicly post U.S. job openings; but this was never done—and these job openings were not posted anywhere publicly in the U.S. Consequently, the American public were never informed of these job opportunities and thereby highly qualified American nationals (workers) were prevented to fill these job openings in the U.S.

15. An investigation into one application for permanent residency for a person with initials S.D. in 2020 resulted in a Notice of Intent to Deny (NOID) from USCIS, prompting the Defendants to order Plaintiff to prepare an appeal letter, dated June 10, 2021, which stated that a person identified here (for privacy) as S.D. had received a bona fide job offer from BoConcept USA, Inc., when S.D.'s work at that time was actually a franchisee role with BoConcept Holding A/S, Inc., which reimbursed BoConcept USA, Inc. for the cost of S.D.'s work-related visa application. Part of Defendant's 2017 agreement with S.D. to become a United State BoConcept franchisee in and later work independently in the United States was, for BoConcept to hire S.D. and also sponsor S.D. as S.D.'s future United States employer, so S.D. could become a permanent resident.

16. In or about January 2024, S.D. was finally approved by USCIS to move forward with an application for permanent residency.

17. But, in or about August 2024, Defendants decided not to honor the job position commitment BoConcept made to S.D. in 2017, on which the permanent residency application was to be based—and instructed Plaintiff to send S.D. a letter to the effect that the BoConcept commitment to the job position would not be honored, and the legal expenses paid by S.D. to BoConcept (upwards of $50,000), associated with S.D.'s Green Card application would be reimbursed. Not only did it become clear at this point to Plaintiff that Defendants had intended to commit visa fraud against the United States government, but also fraudulent misrepresentations to S.D. - a U.S. BoConcept franchisee. Indeed, Defendants

never intended to hire S.D. Plaintiff, therefore, refused to draft, send, or participate in any manner with the letter regarding Defendant's intent to withdraw the job position commitment.

18. Defendants also falsified and ensured a BoConcept USA Inc. application for work authorization (visa) in 2020 for a person with initials E.M., fully aware the applicant was to work permanently for a US BoConcept Franchise (which E.M. did for four years).  In or about May 2024, in response to an inquiry from USCIS, a response with false statements was prepared by directive of Jon Skaalerud (Chief Human Resources Officer at BoConcept), which stated that Plaintiff was the supervisor responsible for E.M., rather than Global Retail Director Michael Linander, in order to insulate the foreign companies (3i Group PLC and BoConcept Holding A/S), Michael Linander, and Jon Skaalerud from liability. Plaintiff complained about this false representation and that the true supervisor should be put on the form (e.g. Jon Skaalerud); but, Defendants ignored Plaintiff's demand and the form which included the false statement was submitted to USCIS per demand from Jon Skaalerud.

19. Defendants filed fraudulent applications in the cases of three other foreign workers: a person with the initials J.O in 2018, a person with the initials K.K in 2019 and David Anderberg in 2021 and 2024. Both K.K. and David Anderberg's applications for work authorization (visa) and permanent residency were ultimately successful - WITHOUT any job offerings being made public in the U.S. and thereby any U.S. nationals were not provided an opportunity to apply for these job openings.

**Fraudulent Misrepresentations And Illegal Conduct re Franchise Agreements:**

20. Defendants routinely engaged in the sale of franchises in various jurisdictions around the world, including but not limited to California, Virginia, Canada, and Australia.  Despite Defendants do not hold a license to sell franchises in these

jurisdictions, as well as, in same or additional jurisdictions, such as Florida, France and Spain, Defendants have authorized numerous BoConcept Brand stores to open and sell BoConcept merchandise to the public without any license or franchise agreement signed and executed, and have proceeded to do so in violation of local statutes for years. There are significant impacts that openings of unauthorized BoConcept stores have on landlords and specifically end-consumers not only in the U.S. but globally. For example, in Florida three BoConcept stores opened and remained opened for years (without Franchise Agreements signed), three landlords were misled, and over 4,500 customers purchased merchandise from these unauthorized stores alone. So, in the case of just one landlord who invested significant amounts of money into building out the premises for what was held out to him as a BoConcept franchisee, later sought to recuperate the funds invested in the premises from the tenant; but the tenant's business went bankrupt—and because in fact the tenant was not officially a BoConcept franchise (despite BoConcept and the tenant misrepresenting as much), the landlord had no remedy and suffered financial losses.

21. BoConcept, in or around October, 2024, repeated that same unlawful conduct in Virginia (allowed unauthorized opening of two stores in Virgina and Washington D.C. where BoConcept was not registered, and no Franchise Agreements were signed)

22. While assigned to a critical Franchisee case in Melbourne, Australia, in or around June 27, 2024 Plaintiff discovered that BoConcept, as a Franchisor had never been registered anywhere in Australia as legally required. When Plaintiff addresses this serious violation of Australian Franchisee Law with Defendants (- when will BoConcept ensure legal registration in Australia), Plaintiff is informed by Klaus Skov Mortensen that he is not allowed to travel to Australia and meet (face-to-face) with the Melbourne Franchisee.

23. This has been the practice since 2012 (and still today). That means the high volume of consumer fraud is still ongoing in Australia - and best estimate is that there are 30,000 cases of customer fraud in Australia alone (each case is a consumer placing an order with a company which has not been legally licensed to operate).

24. In and around September 4, 2024, as the relationship with the Melbourne (Default) Franchisee continuously gets worse, a mandatory court appearance in Australia was scheduled for October 11, 2024.

25. Plaintiff communicates with in-house BoConcept legal counsel and Klaus Skov Mortensen he will not be comfortable making that court appearance (as Plaintiff has been informed by Defendants that BoConcept is, unlawfully, operating its business model in Australia since 2012.) Shortly thereafter, Plaintiff was removed from the Australian Case and in and around October 2024, BoConcept, out-of-court, settles approximately 110 individual cases of potential end-consumer fraud allegations against BoConcept and it's Melbourne, Australia franchisee.

26. While assigned to and supporting the French BoConcept market organization, in and around May and June 2024, Plaintiff discovered that BoConcept executives, in an attempt to unload its unprofitable corporately-owned French 'flagship' store in Beaugrenelle/Paris, purposely misrepresented its own Beaugrenelle Retail Financial Results and Beaugrenelle lease related obligations; consequently, misleading potential investors and commercial banking institutions as to the profitability of this specific corporately-owned BoConcept retail store in Paris and the overall viability and ROI of the BoConcept Franchise business model in general. In September 2024, Plaintiff discovered the store planning and build-out of a new BoConcept store in La Croix Blanche, (Paris, France) had been authorized without any Franchise Agreement executed. (And it became

apparent these discoveries were just the tip of the 'France Iceberg' – and then confirmed by the fact that more than 50% of all French BoConcept Franchises currently are and have been operating at year-on-year losses – and some of these franchisees, increasingly, filing for bankruptcy protection as well.)

27. On or about October 2, 2024, Klaus Skov Mortensen informed Plaintiff via email that he could not approve ongoing business travel to Paris (despite the significant positive financial impact of Plaintiff's French on-site training and turnaround efforts of 65-65% quarterly turnover growth vs French average market decline of 10%.)

28. Between October 11 - 15, 2024 with various emails, and meeting attendances, Plaintiff provided significant knowledge and details related to the Paris franchisee's operation. During these meetings, Plaintiff addressed the unlawful actions Defendant planned to engage in, related to the Paris Franchise – leading to BoConcept senior executives' increasing and noticeable frustrations with Plaintiff's increased knowledge, frankness and truthfulness regarding all of BoConcept's systematic pattern of unlawful behavior and activities globally.

29. On or about October 18, 2024, per request, Plaintiff created and shared an important overview related to the Paris Franchisee Agreements' timelines, except this time, Plaintiff - although Head of Global Task Force, was no longer invited to attend and lead these critical account meetings as he has done previously.

30. Meantime, on or about September 27, 2024, Plaintiff attended a Credit Committee Meeting while the Master Franchisee in Spain was a hot topic. (Primarily because of extremely high debt to BoConcept but also as Plaintiff had discovered that BoConcept Holding A/S has control of the Franchisee from Spain's bank account.) With that control of the Spanish Franchisee's

bank account, BoConcept continuously authorized "illegal and preferential payments"—and thereby guaranteeing wire transfers (money payments) from Spain to BoConcept's bank account in Denmark—to ensure BoConcept's own outstanding and past-due invoices were paid; consequently, preventing other Spanish creditors to get paid, including the Spanish authorities.

31. In and around October 17, 2024, while instigating the unusual investor, funding and payment circumstance around Defendants' Master Franchisee in Spain, and the Franchisee from Spain's various entities, Plaintiff discovered there were also problems with registrations and franchisee agreements in Spain as well.

32. On various occasions prior to October 23, 2024, Plaintiff emailed and asked Klaus Skov Mortensen for permission to fly to Spain to take 'a deep dive' into the business affairs of the Franchisee from Spain. Such requests from Plaintiff to Klaus Skov Mortensen were continuously denied by Klaus Skov Mortensen.

33. The lack of global compliance with franchise law, registrations and licenses means the Defendants never filed or made public any of the required financial disclosures mandated by domestic or local authorities to protect investors, landlords, employees, the public and the global and local marketplaces from bad faith.

**Violation of California Labor Code section 2802:**

34. Meantime, on or about April 30, 2018, BoConcept Franchise, Inc., a subsidiary of 3i Group PLC and BoConcept Holding A/S, Inc. entered into a franchise agreement with the Duvals, along with Teva Concept LLC. This agreement was predicated on sales and market information provided by Defendants that was materially false and misleading—and BoConcept entities were not registered in California at that time either. Note: the additional two stores the Duvals opened

were also sold to them by BoConcept when BoConcept was not registered in California at that time either; and BoConcept A/S employees were, illegally, heavily involved in co-creating operational budgets as well as sales forecasts, profitability and investor ROI.

35.  When the Duvals attempted to renew their franchises in 2022, BoConcept Franchise, Inc. served on the Duvals a Notice of non-renewal in violation of California franchise law.  This sparked a business conflict, which ended with BoConcept, through a newly established (2024) California entity ("USCTO One LLC), purchasing the three California franchises in question from the Duvals in August 2024, and then re-selling them to Michael Webster and James Lunsford via their company, Exceptional Capital one day later.  This offer (to Michael Webster and James Lunsford to purchase these three California franchises) was, again, predicated on false and misleading BoConcept sales information and vitally important investment and financial details that were either intentionally withheld (from Michael Webster and James Lunsford) or, when presented by Defendants, during communication and negotiation, prior to the signing of the Franchise Agreement on or about July 9, 2024, grossly inaccurate. Furthermore, this pre-agreement documentation provided by BoConcept failed to disclose other issues, such as past violations of state and federal law, violations of California bulk sale transfer laws, numerous ADA non-compliance issues, and assorted "operational oddities" that were material issues to the agreement and the supporting financial records. Specifically, the fact that the Defendants, 3i Group PLC and BoConcept executives, and internal BoConcept staff, in and around February and March of 2024, had concluded a high risk and approximately $500,000 in losses associated with ownership and operation of these three Southern California BoConcept franchises and stores. BoConcept was not registered in California when this sale of the three Southern California BoConcept stores took place between BoConcept and Exceptional Capital.

Furthermore, BoConcept A/S staff was heavily involved in the creation of the opening budgets, sales and profitability projections (prior to Exceptional Capital agreeing to purchase these three stores on or about July 9, 2024).

36.  Plaintiff was identified as an individual defendant in a lawsuit initiated by Exceptional Capital on September 8, 2024; but, he was not informed of this fact by his superiors at BoConcept until a meeting on October 3, 2024.

37.  When Plaintiff discovered he was a named defendant in the Exceptional Capital action, he requested indemnification from BoConcept, and attempted to secure outside counsel. Plaintiff complained that Defendants had not only withheld the fact that Plaintiff had been named as a potential defendant in the draft lawsuit (for misrepresentations he was not a part of), but also that Defendants had refused to comply with California Labor Code § 2802 that requires Defendants to provide all "necessary expenditures" including fees and costs for Plaintiff's retention of separate counsel. Specifically, Klaus Skov Mortensen, by email in and around September 11, 2024, denied Plaintiff's request to obtain his own and separate legal counsel (referring to D&O insurance) as the reason there is no "need" for such individual legal counsel – to protect the separate interests of Plaintiff. Needless to say, this denial by Klaus Skov Mortensen triggered tremendous stress on Plaintiff (given the high level of unlawful behavior associated with BoConcept's and David Anderberg's purposeful creation and misrepresentation of extremely important investment information to Exceptional Capital, Mike Webster and James Lunsford prior to July 9th, 2024,  – while promoting the sale of the three California entities to them).

38.  In October 2024, Defendants were aware of the potential adverse interests of the Plaintiff and BoConcept in the Exceptional Capital case — as Plaintiff had now become aware of the substantial extent of the material information Defendants withheld from Exceptional Capital. Critically, documents show, at no time prior to the July 9th, 2024 sale, even if Defendants shared vitally important sales and

financial information with Plaintiff, Plaintiff was never made aware of the existence of Exceptional Capital ("EC"), or Mr. Webster and Mr. Lunsford ("M&J"). Indeed, Plaintiff was not part of any communication or negotiation directly with EC or M&J regarding the purchase of the three Southern California stores recently acquired by Defendants from the Duvals; nor was Plaintiff ever involved in any internal BoConcept meetings about a sale to EC and M&J. Therefore, Plaintiff did not know what information was disclosed to EC and M&J or which material information Defendants had withheld from EC and M&J.

39. Instead, it was exclusively David Anderberg, by specific assignment from BoConcept A/S CEO Mikael Kruse Jensen, who was involved in the confidential purchase communications with Michael Webster and James Lunsford prior to the July 9th, 2024, sale — and as Plaintiff never participated in any internal BoConcept meetings about a potential sale to EC and M&J (prior to July 9, 2024); any material information Defendants withheld would have been withheld by Anderberg. To be sure, a purchase agreement would be reached with EC and M&J, Anderberg, exclusively, had a physical meeting in California in June 2024 with Exceptional Capital and discussed their purchase of the three stores - prior to the execution of their asset purchase agreements and franchise agreements in July 2024. Specifically, without Plaintiff being informed by Defendants, Defendants did not disclose that the three Southern California BoConcept stores had continuing performance and profitability issues, and the U.S. Market as a whole, had declined year on year by respectively approximately 17%, 18% and an additional decline of approximately 14% for January 1 – June 30, 2024 – leading to expected (high volume of) stores closures in the foreseeable future. Furthermore, prior to the July 9th, 2024 sale, Defendants intentionally did not disclose the reasons of forementioned revenue demise, specifically in the US market, where BoConcept's franchise business model no longer has any competitive end-consumer advantages: No real Brand awareness and consumer

loyalty in the US (due to very low Franchisor funded marketing investment and NO US-focused marketing strategy nor US Brand value marketing execution), No transactional e-commerce business model, BoConcept's B2B partnerships and B2B business model (with a US supplier) not offered in the US, BoConcept no longer manufacturing nor offering enormously important "quick-ship upholstery" (from Mexico), the global "Point-of-Sale IT program" and BoConcept's internal design software significantly outdated, very complex and complicated to used (leading to high retail sales-staff departure), BoConcept's US retail prices increased by more 60% over a 4 year period and thereby vacated its previous market position as "affordable luxury" and lastly, David Anderberg's US market leadership and franchise model incompetence and complete lack of general US market knowledge, US multi-store franchise operational experience, commonly known legal US federal and state requirements, and General Accounting skill and financial understanding. Evidence will show, regardless of repeated and fact-based recommendations from Plaintiff for extremely important US market "turnaround investment decisions" - BoConcept executives, specifically BoConcept CEO Mikael Kruse Jensen, Chairman Sanna Savanto-Harsaae, COO Peter Linnet, CPO Susanne Jul Jacobsen, CMO Paula Mc Guiness as well as US Country manager David Anderberg, individually and collectively, decided against such imperative 3i and BoConcept A/S investment recommendations into the US market, consequentially and effectively removing a profitable franchise business model from (current as well as future) new investors and franchisees - such as Exceptional Capital and Mike Webster and James Lunsford.

40.   Starting sometime in August of 2024, BoConcept and David Anderberg began responding to Exceptional Capital's communications without Plaintiff's knowledge, making representations that made it look like it was the Plaintiff's decision to withhold material information from EC and M&J, at any time, prior

to the July 9, 2024, sale.  Plaintiff adamantly denies such representations and accusations by BoConcept and David Anderberg, as Defendants, through its BoConcept Corporate Governance framework, ensured Plaintiff never participated in any internal meetings about a potential sale to Exceptional Capital, and also, through same BoConcept Corporate Governance framework, safeguarded that Plaintiff never even knew of the existence of EC and M&J prior to the July 9th sale.

41.  Between October 16 and 21, 2024, Plaintiff, attempting to defend himself against these allegations by the Defendants, repeatedly requested Defendants affirm indemnification, but he was ignored. Also during this time, Plaintiff reached out to corporate attorneys and leadership regarding how, and when, to bring their franchise law violations into compliance.

42.  On October 21, 2024, Plaintiff again requested indemnification per California Labor Code § 2802.

43.  As explained above, as a Franchisor, BoConcept "sold" and approved openings of retail brand stores but without executed Franchisee Agreements and without being registered.

44. Meantime, in or about October 2024, insignia (Tyson's Galleria Mall) a previous BoConcept Franchise went out of business (in both Virginia and Washington DC). Chapter 7 Bankruptcy was filed on October 8, 2024 by European Urban Décor (Tim Machenaud) - Eastern District of Virginia, Bankruptcy Petition #24-11879-KHK).

45. Plaintiff complained and voiced serious concerns to Defendants by email starting on September 25, 2024, about Defendants illegally operating without being registered in Virginia and Washington DC and without a business and resellers license, completing over 100 individual acts of consumer fraud by completing 'multi-state' sales transactions without any registration, business licenses and insurance, and collecting sales tax from

end-consumers when delivering furniture to these customers (whom had placed orders with the now bankrupt company). Additionally, against Plaintiff's numerous written recommendations and written concerns, documentation will show, per David Anderberg's instruction and Klaus Skov Mortensen authorization, BoConcept purposely removed assets secured by an SBA UCC Lien, from the bankrupt company's warehouse and retail store - prior to the bankruptcy filing. These instructions by David Anderberg, authorized by Klaus Skov Mortensen - against the advice and recommendation of Plaintiff, and the resulting illicit activity constitutes mail and wire fraud. Furthermore, per David Anderberg's recommendation, and against Plaintiff's numerous objections, BoConcept authorized the NJ franchisee to open, operate and sell merchandise in Virginia without a Franchise Agreement and without BoConcept registered there (as always, BoConcept was purposely not registered as Franchisor, in order to save on legal expenses related to proper Franchisor registration).

46. On or about October 9, 2024, Plaintiff refused to sign a BoConcept Representation or Notification Letter regarding the above.

47. On or about October 10 and 11, 2024, Plaintiff addressed the "terms and conditions' associated with the Notification Letter, again voicing serious concerns.

48. In this regard, on or about October 11, 2024 in separate emails: Plaintiff requested authority to register BoConcept in VA and WDC, get licenses, insurance, pay sales tax etc.; Plaintiff acknowledged the BoConcept A/S decision to use a new 'Non-Disclosure' version of a Consumer Letter; Plaintiff again reminded Klaus Skov Mortensen, and David Anderberg, that BoConcept must be licensed, insured, have separate bank accounts before any Sales Tax can be collected.

49. On or about October 11, 2024, Klaus Skov Mortensen emailed his opinion that these (legal requirements) were overly complicated.

50. On or about October 12, 2024, Plaintiff clarified that BoConcept must be insured and have business licenses, collect and pay Sales Tax.

51. On or about October 13, 2024, Klaus Skov Mortensen acknowledged Plaintiff's email.

52. On or about October 13, 2024, Plaintiff, again, reminded Klaus Skov Mortensen that each State has its unique laws, regulations and tax requirements—again voicing concerns about non-compliance.

53. On or about October 15, 2024, Plaintiff, again, addressed the need to be licensed and obligation to file and pay sales tax.

54. On or about October 16, 2024, Plaintiff, again, addressed the same issues.

55. On or about October 17, 2024, Plaintiff advised Defendants that the Tysons entity filed for Chapter 7 bankruptcy, and addressed BoConcept's involvement with a bankrupt company's financials (collecting funds from end-consumers, paying itself as a creditor, withholding pre-approval from a bankruptcy Judge, ignoring mandatory tax filings and preventing other creditors' proportional payments).

56. On or about October 17, 2024, the recommendations from two BC-external advisors were: Franchisor needs to get registered first before sales tax collection, then report and pay sales tax.

57. On or about October 21, 2024, the recommendations from Mike Hillyer (BoConcept USA Inc Controller) were: need sales tax accounts, bank accounts, pay sales tax (in essence, same recommendation as from Plaintiff).

58. On or about October 22, 2024, David Anderberg emailed: "Hi Mike: there is misunderstanding (in essence – this is NOT what I authorize BoConcept to do) I will call you."

59.  In short, against all advice from an outside tax advisor, outside legal counsel, and several complaints from Plaintiff, BoConcept and Klaus Skov Mortensen, heavily influenced and directed by David Anderberg, made the unlawful decision not to register the business, and not to get the obligatory business licenses, insurance, continue with Sales Tax collection, unlawfully authorize removal of physical assets under SBA UCC security agreement and protection, and drive these assets across State lines to New Jersey for BoConcept safe-keeping—without prior authorization from the SBA. Additionally, per David Anderberg's instructions and Klaus Skov Mortensen authorization, BoConcept collected approximately $180,000 directly from customers of the closed Virginia and Washington DC stores, deposited these funds into in own BoConcept USA bank account, and then transferred these funds to a BoConcept A/S bank account in Denmark; thereby preventing the U.S. authorities, the Virginia Bankruptcy Court, and U.S. creditors any opportunity to decrease unpaid invoices (whereas BoConcept, through a foreign wire-transfer and 'self-help' decreased its unpaid invoices by approximately $180,000).

**<u>Violation of California Labor Code sections 201-203</u>:**

60. For over a period of approximately six months in late 2023 through early 2024, Plaintiff complained to (then) Global CFO Darren Bett about Defendants' failure to pay Plaintiff the year-end bonuses he was owed. Plaintiff told Mr. Bett that the Company was not complying with Generally Accepted Accounting Principles—and had purposefully altered the methods of calculating the bonus outcome, so that Plaintiff would no longer meet the threshold for the bonuses. As Bett's employment was terminated in February 2024, this bonus issue was not resolved prior to his termination.

61. In May 2024, Plaintiff, therefore, escalated his complaints to Jon Skaalerup, Global Human Resources Officer at BoConcept Holding A/S, about

Defendants' failure to pay the bonus wages due to him and Defendants' intentional manipulation of the bonus calculation criteria for Defendants' financial gain. Mr. Skallerup did nothing to remedy the situation, nor did Mr. Skallerup ever respond to Plaintiff's complaints.

**Plaintiff's Termination:**

62. Because Plaintiff vociferously complained about Defendants' illegal conduct and he refused to support Defendants' conduct, Defendants terminated Plaintiff.

63. On October 24, 2024, Plaintiff was terminated at a scheduled meeting, despite more than 170 individual complementary (job performance related) "Thank You" & "Great Job" emails received by Plaintiff (between April 2024 and October 2024) from BoConcept Executives (including CEO Mikael Kruse Jensen and Klaus Skov Mortensen), colleagues, investors, partners, global franchises and their employees, landlords, outside consultants and attorneys, as well as US end-consumer online communication. Additionally, his last performance reviews indicated the highest satisfaction with his work and an expansion of his role – following five previous promotions over Plaintiff's 17-year tenure with BoConcept.

64. Plaintiff's Termination Agreement included limited indemnification protection through a Separation and Release of Claim Agreement. This Agreement extended indemnification up to $100,000 and offered one month of salary and benefits as severance. This action effectively distanced Plaintiff from Defendants, and ensured that any legal representation utilized by Plaintiff in any case by a third party against Plaintiff and Defendants, would be controlled by Defendants.

65. Plaintiff was terminated because he refused to participate in Visa fraud, repeatedly complained about Defendant's extensive and deliberate non-compliance with countless domestic and foreign countries' franchise regulations and general business license requirements, complained about Defendants' failure to pay bonus and their intentional manipulation of the bonus criteria, and he

insisted on Defendants' compliance with Labor Code section 2802. He refused to participate in the immigration fraud committed in the appeal letter to the Notice of Intent to Deny letter in the permanent residency application for S.D.; he called attention to the violations of franchise law endemic to Defendant's operations in the U.S. and globally; complained several times about Defendants' violations of California Labor Code sections 201-203; complained several times about violation of his rights under California Labor Code section 2802 during the Exceptional Capital suit as a consequence of Plaintiff newly acquired knowledge that BoConcept had purposely been withholding material information from Exceptional Capital prior to the July 9th 2025 sale.

66. Michael Kruse Jensen, in his role as CEO of BoConcept Holding A/S and Board member of the U.S.-based BoConcept entities/Defendants, enacted a pattern of lawless non-compliance in directing the business dealings of BoConcept and all its subsidiaries.  He failed to ensure that proper licenses were obtained to sell franchises, oversaw the withholding of material facts in the sale of franchises, established a regular practice of immigration fraud, and finally used Plaintiff as a scapegoat when his behavior caught up with him in the form of the Exceptional Capital suit—and decided to terminate Plaintiff's employment.

67.  Boris Tobias Kawohl, and Sanna Suvanto-Harsaae in their role as Chairmen of the Board of Directors of BoConcept Holding A/S, had personal knowledge both of the lawless actions of the company and the retaliation taken against Plaintiff, and they ratified such conduct.

68. Klaus Skov Mortensen, in his role as CFO of BoConcept Holding A/S and Treasurer of the U.S.-based BoConcept entities/Defendants, Executive Management Team member, Credit Committee member, and responsible for the entire Global finance and legal department had personal knowledge both of the lawless actions of the company, but also participated in the majority

of the decisions made since April 2024 including the retaliation taken against Plaintiff.

69. Jon Skaalerud, in his role as the Chief Global Human Resources Officer at BoConcept Holding A/S, enacted a pattern of lawless Director of Human Resource actions (and critical non-actions to purposely defraud Plaintiff), and while directing a regular practice of immigration fraud, most recently in regard to the visa and permanent residency application in 2021-2024 of the un-qualified applicant, and now BoConcept USA Inc., US country manager and employee David Anderberg. Finally, Jon Skaalerud, used Plaintiff as a scapegoat when his behavior caught up with him in the form of the Duval business dispute and the USCIS inquiry to the employment of E.M. and spear-headed the retaliation taken against Plaintiff.

70. David Anderberg entered the U.S. based on falsified work experience and managerial qualifications, visa and permanent residency applications, secured and filed by Jon Skaalerup, BoConcept Holding A/S Global HR Director; and without the job opportunity being made public in the U.S. to allow highly qualified U.S. citizens an opportunity to apply for the BoConcept job (which David Andersen filled without sound work qualifications nor any U.S. business experience). In his role as U.S. and Canadian Country Manager, David Anderberg directed and performed a pattern of lawless business dealings of BoConcept and its subsidiaries, including misrepresentation of authority, unauthorized execution on formal agreement, unlicensed business operations, unauthorized sales tax collection and removal of business assets secured by U.S. Government UCC filing and protection—and unauthorized collection and wire-transfer of approximately $180,000 of Virginia and Washington DC end-consumer payments out of the U.S. to a BoConcept A/S bank account in Denmark. As Mr. Anderberg's failure to conduct honest business practice caught up with him, he finally

used Plaintiff as a scapegoat and issued statements of character defamation (verbally and in writing) in the form of the Exceptional Capital suit.

## FIRST CAUSE OF ACTION

### Retaliation Against a Whistleblower

### (Against All Entity Defendants and DOES 1 – 20)

[California Code § 1102.5 (b)]

71. Plaintiff hereby realleges and incorporates herein by reference each and every allegation contained in this Complaint as if they were fully set forth here.

72. Plaintiff is a whistleblower, and Defendants were an employer, within the meaning of California Labor Code § 1102.5 (b), which states:

> (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

73. Defendants' conduct in terminating Plaintiff, as described in more detail above, constitutes unlawful retaliation under California Labor Code § 1102.5 (b). All Defendants participated in the decision to terminate Plaintiff in retaliation for his complaints.

74. As a proximate result of Defendants' actions, Plaintiff has suffered and

continues to suffer substantial loss of earnings and other employment benefits, and has suffered and continues to suffer pain, embarrassment, humiliation and mental anguish, all to his damage according to proof.

75. Defendants' actions were willful, malicious, fraudulent and oppressive, and were committed with the wrongful intent to injure Plaintiff and in reckless disregard of Plaintiffs rights.

76. Moreover, under California Labor Code § 1102.5 (b), "[i]n addition to other remedies available, an employer is liable for a civil penalty not exceeding ten thousand dollars ($10,000) per employee for each violation of this section to be awarded to the employee who was retaliated against," and "[t]he court is authorized to award reasonable attorney's fees to a plaintiff who brings a successful action for a violation of these provisions."

## SECOND CAUSE OF ACTION

**Violation Of Racketeer Influenced and Corrupt Organizations Act (RICO)**

**Pursuant to Sarbanes-Oxley Act**

**(Against All Defendants)**

[18 U.S.C. § 1962(c) and 18 U.S.C. § 1513(e), *et. seq.*]

77. Plaintiff hereby realleges and incorporates herein by reference each and every allegation contained in this Complaint as if they were fully set forth here.

78. The Sarbanes-Oxley Act added § 1513(e) as a RICO predicate act.

79. Congress enacted the Sarbanes-Oxley Act to address growing concerns about the reliability and accuracy of disclosures made by publicly traded corporations. See Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002). In addition to protecting investors, Title VIII of the Act provides protection for whistleblowers and prohibits retaliation against employees who provide evidence of fraud to a government agency. The Sarbanes-Oxley Act also added subsection (e) to 18 U.S.C. § 1513. That section provides: "Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference

with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

80. Section 1513(f) subjects wrongdoers to the same penalties for entering into a conspiracy to commit such acts.

81. Under RICO, violations of § 1513 are considered "racketeering activity." (18 U.S.C. § 1961(1); see *DeGuelle v. Camilli*, 664 F.3d 192, 195, 200 (7th Cir. 2011)[discussing SOX addition of § 1513(e) and reversing dismissal of RICO claims where employee was terminated after reporting alleged tax fraud scheme to both the company and federal law enforcement]; see *Gianelli v. Schoenfeld*, 2021 U.S. Dist. LEXIS 194530, at *41 (E.D. Cal. Oct. 6, 2021)["the enactment of Sarbanes-Oxley on July 30, 2002, newly established as a RICO predicate act interference with employment in retaliation for reporting a possible federal offense to law enforcement"]; see *Vierria v. Cal. Highway Patrol*, 644 F. Supp. 2d 1219, 1236-37 (E.D. Cal. 2009) [termination of employee constituted racketeering activity under section 1513(e)].)

82. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…"

83. Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

84. Defendants' activities include several acts of racketeering activity since 2018. Accordingly, Defendants' conduct constitutes a "pattern" of racketeering activity. (18 U.S.C. § 1961(5).)

85. Some examples of these acts occurred on or about June 10, 2022, when Defendants, in furtherance of the activities, provide false information to a government agency (USCIS) in order to procure immigration documents for its workers; April of 2024 when Defendants attempted to bully S.D. into accepting an unconscionable franchise agreement; and July of 2024, when Defendants failed to disclose material information when attempting to procure the sale of the same franchises. Each of these can be considered an initial predicate act.

86. Another such act took place on October 24, 2024, when Defendants terminated Plaintiff's employment services contract in retaliation for seeking indemnification regarding the fraud, as well as attempting to redress the lack of compliance with California franchise regulations, as prohibited under California Labor Code § 1102.5 (b).

87. Defendants attempted to lay the blame for the business fraud committed against Exceptional Capital at the feet of the Plaintiff, as well as deprive him of the right to defend himself in the lawsuit because their interests were adverse.

88. To achieve their common goals, Defendants knowingly and willfully concealed from the public and shareholders the fraudulent scheme of the deliberate withholding of material facts and lack of licensure to sell franchises.

89. As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, Plaintiff has been injured in his business and property, has been harmed and his livelihood interfered with, causing Plaintiff to suffer monetary damages, said damages to be proven at the time of trial, including but not limited to lost profits, lost personal income, decreased business profits and increased costs of doing business, lost customers and business relationships, and resulting property injury of interference with Plaintiff's current or prospective contractual relations.

90. Because of Defendants' violations, pursuant to 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the

cost of this suit, including reasonable attorneys' fees.

## **THIRD CAUSE OF ACTION**

**Civil Conspiracy in Violation Of Racketeer Influenced and Corrupt**

**Organizations Act (RICO) Pursuant to Sarbanes-Oxley Act**

**(Against All Defendants)**

[18 U.S.C. § 1962(d) and 18 U.S.C. § 1513(e), *et. seq.*]

91.  Plaintiff hereby realleges and incorporates herein by reference each and every allegation contained in this Complaint as if they were fully set forth here.

92.  Plaintiff was injured "by reason of" a violation of § 1962. (See 18 U.S.C. § 1964(c).) The retaliatory act of terminating Plaintiff's employment services contract for complaining about Defendants fraud scheme under 18 U.S.C. § 1513(e), proximately caused his injuries.

93.  18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

94.  (1) Defendants agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) Defendants and each of them further agreed that one or each of them would commit fraud and retaliate against Plaintiff for complaining about the fraud.

95.  Defendants and each Defendant agreed to and did conspire to violate 18 U.S.C. §§ 1962 (a) and (c), as alleged above and incorporated herein, in violation of 18 U.S.C. § 1962(d). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise described above; and to receive income derived from a pattern of racketeering activity and to use such income or the proceeds of such income in the establishment and operation of that enterprise.

96.  Defendants failed to obtain the necessary licensure to engage in the sale of franchises in California - a pattern of behavior that has played out in Virginia,

Canada, France and Australia, as well.

97.  Defendants conspired to provide false information to the federal government in order to procure immigration documents for its employees as well as other non-BoConcept employed foreign individuals employed by BoConcept Franchisees, and to cover up that fraud with further efforts, including false accounting practices.

98.  Plaintiff attempted to address Defendant's lack of compliance with California franchise law; Defendants terminated his services because of his efforts.

99.  Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise described previously through a pattern of racketeering activity.

100.    Defendants knew that their actions as alleged above were part of a pattern of racketeering activity and agreed to the commission of those acts to further the conspiratorial scheme described above.

101.    Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and (a), in violation of 18 U.S.C. § 1962(d).

102.    An associated-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." (*United States v. Turkette*, 452 U.S. 576, 583 (1981).) To allege an associated-in-fact enterprise, a plaintiff must allege three basic elements: (1) a common purpose; (2) an ongoing organization, whether formal or informal; and (3) that the enterprise functions as a continuing unit.

103.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, Plaintiff has been injured in his business and property, has been harmed and his livelihood interfered with, causing Plaintiff to suffer monetary damages, said damages to be proven at the time of trial, including but not limited to lost profits, lost personal income, decreased business profits and increased costs of doing business, lost customers and business

COMPLAINT

1  relationships, and resulting property injury of interference with Plaintiff's current

2  or prospective contractual relations.

3  104.    Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are

4  liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost

5  of this suit, including reasonable attorneys' fees.

6  **FOURTH CAUSE OF ACTION**

7  **Civil Conspiracy to Commit Retaliation**

8  **(Against All Defendants)**

9  105.    Plaintiff hereby realleges and incorporates herein by reference each and

10  every allegation contained in this Complaint as if they were fully set forth here.

11  106.    The conspiracy consisted of retaliation for Plaintiff's complaints re

12  Defendants' intent to commit fraud and carrying out the fraud. Fraud is a civil

13  wrong that takes a number of forms, including intentional misrepresentation,

14  concealment, and false promise (promissory fraud). (E.g., *Engalla v. Permanente*

15  *Medical Group, Inc.* (1997) 15 Cal.4th 951, 974 [intentional misrepresentation];

16  *Boschma v. Home Loan Center, Inc*. (2011) 198 Cal.App.4th 230, 248

17  [concealment]; *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1059-1060 [false

18  promise].)

19  107.    Defendants and each of them were aware of and participated in the fraud

20  scheme alleged above.

21  108.    Defendants and each of them were aware of and participated in the

22  retaliation alleged above. Defendants and each of them agreed with each other

23  and intended that the retaliation and fraud scheme alleged above be carried out.

24  109.    Plaintiff was harmed as a result of Defendants' conspiracy to commit

25  fraud and retaliation, and suffered significant economic and non-economic

26  damages when he was retaliated against for complaining about the fraud.

27  110.    Defendant's actions were willful, malicious, fraudulent and oppressive,

28  and were committed with the wrongful intent to injure Plaintiff and in reckless

disregard of Plaintiff's rights. Plaintiff, therefore, seeks punitive damages.

## FIFTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

111.    The allegations of paragraphs above are re-alleged and incorporated herein by this reference as though set out fully herein.

112.    Throughout the time Plaintiff worked for Defendants, Defendants knowingly and willfully engaged in the above-described conduct.

113.    Defendants' actions as alleged herein were outrageous and exceeded all bounds usually tolerated by a civilized society and community.

114.    As a result of the foregoing acts and omissions of Defendants, Plaintiff suffered severe mental and emotional distress and anguish, all to Plaintiff's damages in the amount not known which shall be proved at trial.

115.    Defendants had knowledge at the time it engaged in the above-described acts and omissions that such acts and omissions would cause Plaintiff, or any reasonable person, to suffer damages, and Defendants intended by such conduct to cause Plaintiff to suffer damage.

116.    The conduct of Defendants described above was knowing, willful and intentional and engaged in for the purpose of causing, and in fact caused, Plaintiff to suffer. As a result, Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION

## FAILURE TO PAY FINAL WAGES

## AGAINST ALL DEFENDANTS

### [California Labor Code §§ 201-203]

117.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

118.    Defendants failed to immediately pay accrued wages and other

COMPLAINT

compensation due to Plaintiff, and failed to pay accrued wages, including bonus wages, vacation time, and other compensation due, at the time of Plaintiff's initial separation/termination.

119.      As a result, Plaintiff is entitled to back wages, prejudgment interest, reasonable attorney's fees and costs, and waiting time penalties pursuant to California Labor Code § 203 and related statutes.  The exact amounts of such damages are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

120.      In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover prevailing party attorneys' fees and costs pursuant to Labor Code section 218.5.

## SEVENTH CAUSE OF ACTION

## FAILURE TO PROVIDE ITEMIZED AND ACCURATE WAGE AND HOUR STATEMENTS

## AGAINST ALL DEFENDANTS

## [California Labor Code § 226]

121.      Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

122.      For the duration of Plaintiff's employment with Defendants, Defendants misclassified Plaintiff as an "exempt" employee.  As a result, Defendants intentionally and knowingly failed to provide Plaintiff with timely and accurate wage and hour statements showing gross hours earned, total hours worked, all deductions made, net wages earned, and all applicable hourly rates in effect during each pay period and the corresponding number of hours worked at each hourly rate.

123.      Defendants systematically failed to provide such wage statements with accurate information and engaged in a policy of under-reporting and failing

COMPLAINT

to pay for all hours actually worked in violation of California Labor Code §226 and related statutes.

124.    As a result of Defendants' violation of California Labor Code §226 and related statutes, Plaintiff has suffered injuries and damages, including, but not limited to: Plaintiff was not paid wages due; and the absence of an accurate accounting of actual hours worked makes it difficult for Plaintiff to collect wages due, including vacation and sick time.

125.    On each of monthly paystub 173.3hrs was identified (as normal Monthly work hours). For most of the 17 years of Plaintiff's employment, Plaintiff worked a lot more than that and in many cases late at night, more than 12 hrs per day, and over the weekend.

126.    As a result of Defendants' intentional failure to provide Plaintiff with accurate and itemized wage statements, Plaintiff is entitled to damages, including but not limited to, all available statutory penalties, costs, and attorneys' fees, including those provided in California Labor Code §226(e), as well as all other available remedies.

## EIGHTH CAUSE OF ACTION

**VIOLATION OF BUSINESS AND PROFESSIONS CODE §17200, *et seq;*
AGAINST ALL DEFENDANTS**

127.    Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

128.    California Business and Professions Code §17200 provides: "As used in this chapter, unfair competition shall mean and include any unlawful or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

129.    Wage and hour laws express fundamental public policies. Providing employees with wages for all hours worked, rest breaks, and providing

accurate itemized records are fundamental public policies of this State. Labor Code § 90.5(a) articulates the public policies of this State to enforce vigorous minimum labor standards, to ensure that employees are not required or permitted to work under substandard and unlawful conditions, and to protect employers who comply with the law from those who attempt to gain a competitive advantage by failing to comply with minimum labor standards.

130. Through the conduct alleged herein, Defendants have acted contrary to these public policies, have violated specific provisions of the Labor Code, and have engaged in other unlawful and unfair business practices in violation of California Business and Professions Code §17200, et seq., depriving Plaintiff of rights, benefits, and privileges guaranteed to all employees in California.

131. During the course of Plaintiff's employment, Defendants engaged in multiple violations of the California Labor Code by failing to pay bonus wages, vacation pay, sick pay, and other compensation due to Plaintiff, and by failing to provide accurate and itemized statements of Plaintiff's wage and hours.

132. Defendants' conduct, as alleged hereinabove, constitutes unfair competition in violation of §17200 et seq., of the California Business and Professions Code.

133. The acts of Defendants, as previously described above, were unfair, unlawful, and fraudulent as defined in California Business and Professions Code §17200, et seq. Such acts constitute an unfair business practice and unfair competition, thus violating California Business and Professions Code §17200 et seq. As a result, Defendants obtained valuable property, money and services from Plaintiff, including earned wages for all hours worked and have deprived them of valuable rights and benefits guaranteed by law, all to the detriment of Plaintiff and to the benefit of Defendants so as to allow Defendants to unfairly compete against competitors who comply with the law.

134.    As a result of the foregoing conduct, Plaintiff is entitled to recover restitution damages in the form of payment of unlawfully withheld wages. Plaintiff is also entitled to recover reasonable attorneys' fees pursuant to Code of Civil Procedure §1021.5, the substantial benefit doctrine.

## NINTH CAUSE OF ACTION

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

### (Against All Entity Defendants and DOES 1 – 20)

135.    Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

136.    Plaintiff was employed by the Entity Defendants.

137.    Defendants' conduct, including their retaliation following the complaints of the Plaintiff, led to his termination.

138.    Defendants' termination of Plaintiff violated public policy that requires employers to pay wages due and not to retaliate against employees for raising valid concerns about the employers' potential illegal conduct.

139.    As a proximate result of Defendants' wrongful termination of Plaintiff, Plaintiff has suffered and continues to suffer past and future lost earnings, employment benefits, and opportunities and experience, and other special and compensatory damages, along with prejudgment interest.

140.    As a further proximate result of Defendants' wrongful termination of Plaintiff, Plaintiff has suffered and continues to suffer financial damage and hardship, along with physical, mental, and emotional anguish, distress, pain, and suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, worry, shock, and embarrassment, and other economic and non-economic losses.

141.    The conduct of Defendants, by and/or ratified by managing agents, was performed with the intent to cause injury, was despicable and a willful, knowing, and deliberate disregard for the rights and well-being of Plaintiff,

COMPLAINT

which subjected him to cruel and unjust hardship, and which was so vile, base, or contemptible that it would be looked down on and despised by reasonable people. Defendants further intentionally misrepresented or concealed material facts with the intent to and which did cause harm to Plaintiff. Defendants' conduct constitutes malice, oppression, and/or fraud as defined in California Civil Code § 3294, entitling Plaintiff to an award of punitive or exemplary damages in an amount sufficient to punish and deter Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, for:

1. Compensatory and actual damages in an amount to be proven at the time of trial;

2. For costs of the suit incurred herein;

3. For punitive and exemplary damages in an amount to be proven;

4. Penalties under the California Labor Code;

5. For reasonable attorneys' fees under RICO and California Labor Code § 1102.5 (b), and all related statutes;

6. Treble damages under RICO (18 U.S.C. § 1964(c));

7. For pre- and post-judgment interest at the prevailing statutory rates;

8. A declaratory judgment that the practices complained of in this Complaint are unlawful under California law;

9. An injunction against Defendants, their officers, agents, successors, representatives, and any and all persons acting in concert with them from engaging in the practices complained of in this Complaint; and

10. For such other relief as the court may deem proper.

Dated: August 11, 2025          CANTOR LAW

By     */s/ Zachary Cantor*
_____
ZACHARY CANTOR, ESQ.,

Attorney for Plaintiff

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands a jury trial for the causes of action set forth herein.

Dated:  August 11, 2025          CANTOR LAW

                                   By      */s/ Zachary Cantor*
                                           ZACHARY CANTOR, ESQ.,
                                           Attorney for Plaintiff

COMPLAINT